IN THE CIRCUIT COURT OF PULASKI COUNTY, MISSOURI
WAYNESVILLE, MISSOURI

*FILED*
RACHELLE K. BEASLEY

AUG - 9 2012

CIRCUIT CLERK & EX. OFFICIO
RECORDER OF DEEDS
PULASKI COUNTY, MISSOURI

KENNETH D. WIVELL and
TINA M. WIVELL, Husband and Wife
1860 Durango
Phillipsburg, MO 65722

     Plaintiffs,

vs.

WELLS FARGO, BANK, N.A.,
d/b/a WELLS FARGO HOME
MORTGAGE,

     Serve at:
     Corporate Representative
     1000 Blue Gentian Road, Ste. 300
     Eagan, Minnesota 55121

and

KOZENY & MCCUBBIN, L.C.,

     Serve at:
     McCubbin, Garry
     12400 Olive Blvd, Suite 555
     St. Louis MO 63141

     Defendants.

Case No. 12PU-CV01555

DEMAND FOR JURY TRIAL

## PETITION

     Plaintiffs Kenneth D. Wivell and Tina M. Wivell husband and wife, by and through their

attorneys of record, state the following as their cause of action:

### PARTIES

1.    Plaintiffs reside at 18601 Durango Lane, Laclede County, Phillipsburg, Missouri 65722.

1

2. Defendant Wells Fargo Bank of America, N.A., d/b/a Wells Fargo Home Mortgage ("Wells Fargo") is a national banking corporation engaged in the business of banking and real estate services throughout the State of Missouri.

3. Upon information and belief, Wells Fargo conducts business throughout Missouri, including in Pulaski County, Missouri, directly and through its Agents, Attorneys at Law and Attorneys in Fact, including Defendant Kozeny & McCubbin, L.C. ("Kozeny"), a law firm with offices in St. Louis County, Missouri.

4. Defendant Kozeny & McCubbin, L.C., a Missouri limited liability company, is a law firm with offices in St. Louis County, Missouri that conducts business throughout Missouri, including in Pulaski County, Missouri.

## JURISDICTION, VENUE, AND REQUEST FOR JURY TRIAL

5. The Court has personal and subject matter jurisdiction pursuant to §§ 506.500 and 351.582 RSMo.

6. Venue is proper pursuant to §§ 508.010(4) and 407.025 RSMo because Plaintiffs were first injured in Pulaski County. Further, venue is proper because the property that is the subject of this suit is located in Pulaski County, Missouri, Plaintiffs' purchased said property in Pulaski County, and the facts giving rise to this cause of action arose in Pulaski County.

## REQUEST FOR JURY TRIAL

7. Plaintiffs ask that this case be tried by jury.

2

## GENERAL ALLEGATIONS REGARDING DEFENDANT WELLS FARGO

8.  At all times relevant to the claims made herein, Defendant Wells Fargo acted through its agents, representatives, officers, or employees.

9.  At all times relevant to the claims made herein, Defendant Kozeny acted through its agents, representatives, officers, or employees.

10. Defendants, in all respects stated in this Petition, acted in concert with each other.

11. On or about February 13, 2006, Plaintiffs purchased the home located at 15515 Top Drive, St. Robert, Missouri 65584, hereinafter referred to as the "Property," and described as follows:

    > All of Lot 52 in Thousand Hills Subdivision Plat 17, a Subdivision in Pulaski County, Missouri, per the plat thereof filed in the Recorder's Office of Pulaski County, Missouri. Subject to easements, restrictions, and reservations of record.

12. Wells Fargo financed the Plaintiffs' purchase of the home in the amount of $147,000.00, and a written Deed of Trust was executed by the parties, a copy of which is attached hereto as "Exhibit A."

13. Plaintiffs purchased said home and property with the reliance and assurance that Wells Fargo would finance the same with full knowledge of Plaintiff Kenneth D. Wivell's overseas employment obligations with the United States Government, Department of Defense.

14. On or about January 1, 2009, while still current on payments, Plaintiffs contacted Wells Fargo in order to conduct a loan modification on said home and property. Wells Fargo discussed a moratorium with Plaintiffs and told Plaintiffs that they must be in default before the moratorium could be discussed.

3

15. In March 2009, Plaintiffs called Wells Fargo regarding the moratorium and were informed by Wells Fargo that they must be 90 days past due before the moratorium could be obtained.

16. Wells Fargo instructed Plaintiffs to stop making payments so they could be considered for a moratorium.

17. Plaintiffs acted upon Wells Fargo's advice and stopped making payments.

18. In April 2009, after missing payments as ordered by Wells Fargo, Plaintiffs again called Wells Fargo to check on the possibility of a moratorium. Wells Fargo informed Plaintiffs that it did not have a moratorium program and Plaintiffs would instead have to do a loan modification. Plaintiffs faxed all requested paperwork numerous times, as requested by Wells Fargo.

19. In May 2009, Plaintiffs called Wells Fargo to check on the status of the modification and were told that it could take up to 90 days to receive an answer.

20. In June 2009, Plaintiffs were told by Wells Fargo that they had been denied a modification because too much time had elapsed, and that Plaintiffs would have to start the process for a loan modification over. Plaintiffs thus began the process for another loan modification. Plaintiffs faxed all requested paperwork to Wells Fargo numerous times because Wells Fargo repeatedly denied receiving the paperwork sent by the Plaintiffs.

21. Plaintiffs attempted to make a payment but were told that nothing but the full balance amount would be accepted.

22. In July 2009, Plaintiffs called Wells Fargo to check on the status of the modification and were informed that there was no answer and that it may take up to 90 days before an

4

answer would be forthcoming. Plaintiffs were informed by Wells Fargo that they were being put into foreclosure at this time.

23. In August 2009, Plaintiffs called Wells Fargo to check on the modification status and were informed by the bank that Plaintiffs had agreed to pay $1,500 per month until the past-due amount was paid in full. Plaintiffs disputed that they had agreed to this. Plaintiffs were informed by Wells Fargo that they would be put into another loan modification and that they were again put onto foreclosure status at this time.

24. In October 2009, Plaintiffs called to check on the status of the modification and were informed that was still in review. Plaintiffs attempted to make a payment at this time, but Wells Fargo rejected Plaintiffs' attempt to make a good faith payment, saying that nothing but the full balance amount would be accepted.

25. In November 2009, Plaintiffs called Wells Fargo to check on the status of the modification and were informed that it was still in review.

26. In December 2009, Plaintiffs called Wells Fargo to check on the status of the loan modification and were told that the home was up for foreclosure in January 2010. Plaintiffs submitted another request for a loan modification at this time. They did so because they were affirmatively told by Wells Fargo that it would stop the foreclosure process.

27. From about January 18, 2010, to January 29, 2010, Plaintiffs repeatedly called Wells Fargo to check on the status of the loan modification and were told to make three good faith payments and then following these payments to call and get the rest of the payment arrangements.

5

28. Plaintiffs made the requested good faith payments for the months of February, March, and April 2010.

29. From about April 12, 2010 to April 23, 2010, Plaintiffs were informed by Wells Fargo that they must pay a $14,000 balloon payment. Plaintiffs informed Wells Fargo that they could not make this payment. As a result, they were put in for another loan modification.

30. From about April 15, 2010, to April 25, 2010, Plaintiffs called Wells Fargo to check on the status of the modification and to verify that all paperwork had been received. Plaintiffs were told that they would receive an answer when a decision was reached, but that it could take up to 90 days.

31. On or about June 4, 2010, Plaintiffs called Wells Fargo to check on the status of the modification and were told that it had been denied. Plaintiffs did not receive any notification of this denial from Wells Fargo. Plaintiffs also informed Wells Fargo that Plaintiff Kenneth Wivell, who is a Department of Defense employee, had just returned from Iraq on June 2, 2010. Upon hearing this, Wells Fargo informed Plaintiffs that because of this the foreclosure date would be moved back. Plaintiffs completed a financial worksheet at this time, as requested by Wells Fargo, and were told that they did not qualify for a modification, but that a financial packet would be sent for them to fill out.

32. On or about June 12, 2010, Plaintiffs were notified by Kozney that their home and property were being foreclosed upon by power of sale foreclosure and the date of the sale was June 30, 2010 at 9:00 A.M.

33. On or about June 12, 2010 when Plaintiffs were notified that foreclosure proceedings were being commenced, Plaintiffs had equity in the property. That is, the fair market

6

value of the property at the time exceeded the aggregate amount of all liens against the property. At the time the foreclosure proceedings were commenced, Plaintiffs had made every monthly payment requested by Wells Fargo and were only alleged to be in default because they followed Wells Fargo's instructions.

34. On or about June 17, 2010, Plaintiffs faxed the requested financial packet and called to verify the bank's receipt, but Wells Fargo told them to call back.

35. On or about June 18, 2010, Plaintiffs called to verify receipt of the packet and were informed by Wells Fargo that everything had been received. Plaintiffs inquired into the length of this process due to the foreclosure date of June 30 and were told to call back in a couple of days.

36. On or about June 23, 2010, Plaintiffs called Wells Fargo to check on the status of the modification. Plaintiffs were informed that the modification was in its last stages and that a negotiator would be calling them to give them their options for a payment plan. Plaintiffs asked if this would stop all foreclosure processes and were informed by Wells Fargo that it would.

37. On or about June 30, 2010, Plaintiffs contacted Wells Fargo because, contrary to Wells Fargo's assertion, they had never been contacted by the negotiator. Plaintiffs were informed that their property had been sold that morning. Wells Fargo also told the Plaintiffs that they had not been in any active loan modification process.

38. Plaintiffs allege that on or about dates described above, Wells Fargo represented that it would waive past defaults by Plaintiff under the note and deed of trust, and that it would not foreclose the deed of trust.

7

39. In reliance on the representations by Wells Fargo, Plaintiffs made additional improvements to the real estate and made partial payments on the note described herein, and otherwise changed their position to their detriment.

40. Notwithstanding Wells Fargo's representations made to Plaintiffs, Wells Fargo proceeded to foreclose on the deed of trust described herein, without proper notice to Plaintiffs and contrary to the terms and conditions of the deed of trust, depriving Plaintiffs of any opportunity to cure past defaults, all of which occurred only due to Wells Fargo's instructions and/or advice.

## GENERAL ALLEGATIONS REGARDING DEFENDANT KOZENY & MCCUBBIN

41. At various points between April 2010 and June 30, 2010, Plaintiffs repeatedly contacted Defendants Kozeny & McCubbin, the purported successor trustee, for the purpose of gaining the information necessary to reinstate the loan.

42. During each contact, Plaintiffs detailed their frustrations and concerns relating to Wells Fargo, as described in the General Allegations Regarding Wells Fargo.

43. In particular, Plaintiffs explained to Kozeny that Wells Fargo refused to give Plaintiffs the information necessary to stop the foreclosure process and reinstate Plaintiffs' loan. Plaintiffs also described to Kozeny the numerous instances in which Wells Fargo reportedly "lost" or "did not receive" Plaintiffs' paperwork, thus stalling or preventing the loan modification process.

44. On each occasion, Kozeny told Plaintiffs that they "worked for" Wells Fargo, and refused to provide Plaintiffs any information whatsoever.

45. Despite Plaintiffs' repeated calls to Kozeny and their repeated requests for information from Kozeny, Kozeny refused to comply with the reasonable requests of Plaintiff, refused

8

to provide Plaintiffs any assistance whatever, and merely told Plaintiffs to contact the "loan holder," i.e. Wells Fargo.

46. Kozeny failed to carry out the duties of trustee and, far from being neutral, expressly stated that it worked Wells Fargo. .

47. Despite its full knowledge of Plaintiffs' objections to the validity of the foreclosure, Kozeny proceeded to sell Plaintiffs' property, thereby depriving Plaintiffs of their property and of any equity of redemption, and further damaged Plaintiffs as set forth in this Petition.

48. These actions were in violation of Kozeny's duties as a trustee and in violation of the deed of trust.

## COUNT I
### Wrongful Foreclosure Against Both Defendants

49. Plaintiffs re-allege and restate all allegations contained in this Petition as if set forth fully herein.

50. Defendants foreclosed on Plaintiffs' home wrongfully and without any legal right to do so.

51. To the extent that it appeared that Plaintiffs were in default, Defendants had no legal right to foreclose because Plaintiffs they were lulled and misled into default.

52. For the reasons stated about, Plaintiffs were not truly in default.

53. Plaintiffs would not have been in default at the time Wells Fargo initiated foreclosure, except for the misconduct of the Defendants.

54. Defendants are thus estopped from raising lack of default as a defense to this claim.

9

55. Plaintiffs took all reasonable steps to abide by the instructions given them by Wells Fargo throughout the relevant time period.

56. As described above, Plaintiffs were lulled into default by Wells Fargo.

57. Wells Fargo lulled and mislead Plaintiffs into making payments under the pretense that it would stop the foreclosure process. Despite these representations, Defendants foreclosed.

58. Wells Fargo's failure to properly apply payments and miscalculations of monies caused harm to Plaintiffs and led to the wrongful foreclosure.

59. As a direct and proximate result of Defendants' wrongful foreclosure, Plaintiffs have suffered economic and personal injuries as set forth in the Damages Section toward the end of this Petition.

60. For this Count, Plaintiffs seek relief set forth in the Prayer. Alternatively, Plaintiffs request that this Court grant equitable relief by setting aside the sale of Plaintiffs' home and granting such other relief as the Court deems as appropriate.

## COUNT II
### Fraudulent Misrepresentation against Both Defendants

61. Plaintiffs re-allege and restate all allegations contained in this Petition as if set forth fully herein.

62. On or about the dates described in Paragraphs in the preceding paragraphs, Wells Fargo made numerous false and misleading representations, including:

   a. that it would waive Plaintiffs' past defaults under the note and deed of trust;

   b. that Plaintiffs qualified for a loan modification;

   c. that applying for a loan modification would stop the foreclosure process;

10

d. that Plaintiffs were not in active foreclosure;

e. that Wells Fargo's representatives would contact Plaintiffs to offer assistance; and

f. that Wells Fargo would not foreclose the deed of trust.

g. That Kozeny only owed duties to Wells Fargo, not the Plaintiffs.

63. Moreover, on or about the dates described in the preceding paragraphs, Kozeny falsely represented that it "worked for" Wells Fargo. Kozeny further represented that it had no information about Plaintiffs' situation and that it could not help them stop the foreclosure process or keep their home.

64. Upon information and belief, Kozeny could have obtained information for Plaintiffs and had a duty to do so as a trustee.

65. At all relevant times, Defendants knew these representations to be false, or acted with reckless disregard to their truth or falsity.

66. Defendants made these false representations with the intent that Plaintiffs would act on them in a manner reasonably contemplated.

67. Specifically, Defendants intended to lull Plaintiffs into believing that any previous defaults would not result in foreclosure so long as they continued to miss payments, thereby increasing the likelihood of foreclosure, reducing equity, and preventing Plaintiffs from refinancing their loan.

68. Plaintiffs, being in a disadvantaged position and having unequal access to information and resources, did not know that Defendants' representations were false.

69. Plaintiffs had a right to rely on Defendants' false representations because:

a. Defendants both presented themselves as knowledgeable regarding the situation.

11

b. Defendants made such representations in order to induce Plaintiffs into missing payments, and to prevent Plaintiffs from taking other measures to stop the foreclosure process;

c. the facts underlying the representations described in the preceding paragraphs were peculiarly within Defendants' knowledge and difficult for Plaintiffs to ascertain;

d. the representations described above pertained to Defendants' then-present intentions to not modify Plaintiffs' loan and to fail to stop the foreclosure process, and concerned matters within Defendants' control.

70. Plaintiffs did in fact rely on Defendants' false and misleading representations.

71. As a direct and proximate result of Plaintiffs' justifiable reliance on Defendants' false and misleading representations, Plaintiffs have suffered economic and personal injuries as set forth in the Damages.

72. Accordingly, Plaintiffs seek relief as set forth in the Prayer.

## COUNT III
### Violation of the Missouri Merchandising Practices Act against Both Defendants

73. Plaintiffs re-allege and restate all allegations contained in this Petition as if set forth fully herein.

74. Defendants provided services pursuant to the Missouri Merchandising Practices Act (hereinafter "MMPA"), RSMo § 407.010; Wells Fargo sold a loan to the Plaintiffs, and was charged with collecting payments, calculating interest, providing customer support to Plaintiff, and was in the process of ostensibly offering a loan modification to the Plaintiffs.

12

75. Wells Fargo's actions occurred in relation to the sale of the home and collecting money owed due to the sale.

76. Wells Fargo received payment for these services, as fees charged by Wells Fargo constituted a portion of the monthly mortgage payment it received from Plaintiffs.

77. Kozeny received payment for its services, as it received fees relating to its acts and omissions as trustee with regard to the sale of Plaintiffs' home.

78. By its actions, as described in the preceding paragraphs Wells Fargo used and employed unfair, deceptive, and misleading practices in connection with the servicing of Plaintiffs' mortgage by:

    a. promising Plaintiffs a modification to lull Plaintiffs into a false sense of security;

    b. failing to suspend foreclosure while processing Plaintiffs' request for a modification;

    c. wrongfully foreclosing on Plaintiff's home; and

    d. making false and misleading representations regarding Plaintiffs' requests for loan modification and Plaintiffs' ability to stop foreclosure proceedings.

79. Further, as described in the preceding paragraphs, Kozeny employed unfair, deceptive and misleading practices by providing false and misleading information regarding its relationship with Wells Fargo, suggesting it had no access to information about Plaintiffs' loan, by categorically refusing to aid or assist Plaintiffs in any way, and by failing to carry out its duties as Trustee.

80. Such unfair, deceptive, and misleading practices caused Plaintiffs to suffer ascertainable loss of money and property as described in the Damages.

81. Accordingly, Plaintiffs request relief as outlined in the Prayer.

13

## COUNT IV
## Civil Conspiracy against Both Defendants

82.  Plaintiffs re-allege and restate all allegations contained in this Petition as if set forth fully herein.

83.  Defendants maliciously and with intent to injure Plaintiffs, combined and agreed together on a plan and scheme to wrongfully foreclose on Plaintiffs' home, to fraudulently misrepresent material information, and to employ unfair, deceptive, and misleading practices.

84.  Defendants engaged in these unlawful practices for the purpose of lulling Plaintiffs into missing payments, thereby increasing the likelihood of foreclosure, reducing equity, and preventing Plaintiffs from refinancing their loan.

85.  Defendants agreed to pursue this unlawful purpose after a meeting of the minds, based on communications between the two Defendants.

86.  In furtherance of the conspiracy, Defendants engaged in numerous acts described above in this Petition, including but not limited to:

   a.  Defendants' repeated attempts to avoid furnishing information by "ping-ponging" Plaintiffs—i.e. Wells Fargo repeatedly insisted that only Kozeny could furnish information regarding loan reinstatement, while at the same time Kozeny insisted that only Wells Fargo could provide such information.

   b.  Wells Fargo's numerous false and misleading statements regarding Plaintiffs' qualifications for loan modification;

   c.  Wells Fargo's numerous false and misleading statements that it would stop the foreclosure process;

14

d. Wells Fargo's failure to suspend foreclosure while processing Plaintiffs' request for a modification;

e. Kozeny's insistence that it "worked for" Wells Fargo;

f. Kozeny's repeated refusals to aid or assist Plaintiffs in any way; and

g. Kozeny's false and misleading statements that it had no information regarding Plaintiffs' loan.

87. All of the above-mentioned acts contributed to the Defendants' successful commission of wrongful, fraudulent, and deceptive practices in furtherance of the conspiracy, including the wrongful conduct set forth in each of the counts of this Petition.

88. As a direct and proximate result of Defendants' actions, Plaintiffs have suffered economic and personal injuries as set forth in the Damages.

89. Accordingly, Plaintiffs seek relief as set forth in the Prayer.

## COUNT V
### Negligence against Both Defendants

90. Plaintiffs re-allege and restate all allegations contained in this Petition as if set forth fully herein.

91. Wells Fargo, acting as lender and servicer of Plaintiffs' loan, owed Plaintiffs a duty of good faith, which includes the observance of reasonable commercial standards of fair dealing.

92. Wells Fargo, as lender and servicer, was required to exercise reasonable care in exercising its responsibilities by properly applying payments, calculating appropriate and legitimate interest and fees, and providing accurate customer service.

15

93. Kozeny, acting as trustee, had assumed a duty and responsibility for overseeing the servicing of Plaintiffs' loan.

94. It was reasonably foresseeable by both Wells Fargo and Kozeny that failure to carry out the above described duties carefully could result in irreparable harm to Plaintiffs, including wrongful foreclosure.

95. Accordingly, Defendants were duty bound to exercise reasonable care in the servicing and oversight of Plaintiffs' loan.

96. As described throughout this Petition, Wells Fargo breached its duty by continually mishandling Plaintiffs' paperwork, providing false and misleading information regarding Plaintiffs' qualifications for loan modification, and providing false and misleading information regarding Plaintiffs' ability to stop the foreclosure process.

97. Moreover, as described in the preceding paragraphs, Kozeny breached its duty of care by providing false and misleading information regarding its relationship with Wells Fargo, suggesting it had no access to information about Plaintiffs' loan, and by categorically refusing to aid or assist Plaintiffs in any way.

98. As a direct and proximate result of Defendants' negligence, Plaintiffs have suffered economic and personal injuries as set forth in the Damages.

99. Accordingly, Plaintiffs seek relief as set forth in the Prayer.

## COUNT VI
### Negligent Misrepresentation Against Both Defendants

100. Plaintiffs re-allege and restate all allegations contained in this Petition as if set forth fully herein.

101. On or about the dates described in the preceding paragraphs, Wells Fargo, in the normal course of its business as a lender, represented to Plaintiffs that they qualified for various loan modifications, that applying for and obtaining such modifications would stop the foreclosure process, that Plaintiffs were not in active foreclosure, and that Wells Fargo's representatives would contact Plaintiffs to offer assistance.

102. On or about the dates described in the preceding paragraphs, Kozeny, in relation to its status as trustee, represented to Plaintiffs that it "worked for" Wells Fargo, that it had no information about Plaintiffs' loan, and that it could not aid or assist Plaintiffs in any way, and failed to provide any information or assistance to Plaintiffs.

103. Defendants failed to exercise reasonable care in ensuring that the information it represented to Plaintiff was true and accurate.

104. As a result of Defendants' failure to exercise reasonable care, and the fact that Defendants were acting negligently, Defendants' representations as described in this Count were false and misleading.

105. Plaintiffs, believing Defendants were exercising reasonable care and were thus providing true and accurate information, justifiably relied on Defendants' false representations in applying for loan modifications, making payments, and in deciding what actions to pursue (or not pursue) in relation to the foreclosure process.

106. As a direct and proximate result of Defendants' false representations, Plaintiffs have suffered economic and personal injuries as set forth in the Damages.

107. Accordingly, Plaintiffs seek relief as set forth in the Prayer.

## COUNT VII
### Breach of Fiduciary Duty against Defendant Kozeny & McCubbin, L.C.

108. Plaintiffs re-allege and restate all allegations contained in this Petition as if set forth fully herein.

109. On or about November 4, 2009, Kozeny was appointed successor trustee for Plaintiffs and Wells Fargo.

110. As trustee, Kozeny was an agent to both Plaintiffs and Wells Fargo, and thus owed fiduciary duties to both parties, including duties of neutrality, integrity, fairness, and impartiality.

111. Kozeny further owed duties to Plaintiffs because it was in a position of superior knowledge, having access to a file provided by Wells Fargo describing the Plaintiffs' business relationship with Wells Fargo.

112. Kozeny breached its fiduciary duties owed to Plaintiffs by:

    a. failing to investigate the questionable circumstances surrounding the foreclosure proceedings despite having actual knowledge of circumstances that would legally prevent foreclosure;

    b. failing to consider evidence that would have prevented foreclosure;

    c. representing that it "worked for" Wells Fargo;

    d. failing to disclose to Plaintiffs any information that prevented it from serving as a neutral;

    e. falsely representing that it had no information regarding Plaintiffs' loan;

    f. refusing to aid or assist Plaintiffs in any way;

    g. selling Plaintiffs' home despite the clear lack of legal right to do so; and

18

h. accepting trustee's fees in the foreclosure sale of Plaintiffs.

i. failing to obtain basic information justifying foreclosure, including that:

    i. the actual note holder is the party initiating foreclosure;

    ii. the note holder has authority to act pursuant to the deed of trust;

    iii. the party appointing a successor trustee had the authority to do so; and

    iv. the party initiating foreclosure is not known to provide inaccurate or false information, either intentionally or negligently.

113. Kozeny did not meet any of these prerequisites before proceeding with the foreclosure sale of Plaintiffs' home.

114. Kozeny proceeded with the foreclosure sale despite having actual knowledge that there was no right to foreclose.

115. Kozeny's conduct was fraudulent, unfair, and constituted an abuse of discretion.

116. Thus, Kozeny breached its duties to act with neutrality, integrity, fairness, good faith, and impartiality.

117. Kozeny's breach of its fiduciary duty meant that precisely when Plaintiffs' most needed a neutral party, prior to foreclosure, they did not have one.

118. As a direct and proximate result of Kozeny's breach, Plaintiffs have suffered economic and personal injuries as set forth in the Damages.

119. Accordingly, Plaintiffs seek relief as set forth in the Prayer.

## COUNT X
### Unjust Enrichment against Defendant Kozeny & McCubbin, L.C. for Recovery of Fees

120. Plaintiffs re-allege and restate all allegations contained in this Petition as if set forth fully herein.

19

121. Defendant Kozeny & McCubbin received trustee fees in connection with its role in the foreclosure sale described in this Petition.

122. It has appreciated, accepted, and has retained these fees despite the unlawful conduct, as described in this Petition.

123. If Kozeny & McCubbin had acted lawfully and in good faith in its role as trustee, it would not have been obtained said fees for its role in the foreclosure sale.

124. Accordingly, it would be inequitable and unjust for Kozeny & McCubbin to retain this benefit.

125. As a result, Plaintiffs seek recovery of the trustee's fees charged by Kozeny and paid by Plaintiffs, and any commission retained from the sale of Plaintiffs' home.

## DAMAGES

126. Defendants' conduct, as described throughout this Petition, was extreme, outrageous, and recklessly indifferent, thus warranting an award of punitive damages.

127. As a result of Defendants' unlawful conduct as described throughout this Petition, Plaintiffs have suffered the following injuries:

    a. loss of their home and property;

    b. loss of the value of incurred repair costs and improvements that they performed on said home and property;

    c. Plaintiffs' Credit Score and Credit History have been severely harmed;

    d. Plaintiffs and their children have suffered emotional distress and exacerbated illness;

20

e. Plaintiffs have spent a sum in excess of $150,000.00 out-of-pocket over and above the contract price to not only purchase said residence, also but to make said residence habitable and make improvements thereon;

f. Plaintiffs have suffered additional damages for the loss of their home and property in the approximate sum of $44,202, which is the difference between the reasonable market value of the property and the aggregate amount of the liens thereon at the date of the foreclosure sale; and

g. Plaintiffs have been required to hire an attorney to protect their interests, and have thus incurred and are currently paying reasonable attorney fees for this representation.

## PRAYER FOR RELIEF

128. Plaintiffs therefore request that the Court enter judgment in their favor and against all Defendants as follows:

h. Awarding Plaintiffs compensatory damages, to include any fees and interest illegally charged and further awarding any damages caused by such payments;

i. Awarding Plaintiffs their consequential and incidental damages;

j. Awarding total damages in excess of $25,000;

k. Awarding Plaintiffs pre-judgment and post-judgment interest as provided by law;

l. Awarding Plaintiffs punitive damages as provided by law;

m. Awarding Plaintiffs attorneys' fees and costs as provided by law;

n. Awarding Plaintiffs and the Class such other and further relief as may be just and proper.

21

Respectfully submitted,

**The Simon Law Firm, P.C.**

Erich V. Vieth #29850
John E. Campbell #59318
800 Market Street, Suite 1700
Saint Louis, Missouri 63101
P. 314.241.2929
F. 314.241.2029
evieth@simonlawpc.com
jcampbell@simonlawpc.com

AND

**Aleshire Robb, P.C.**
Gregory W. Aleshire #38691
2847 S. Ingram Mill Road, Suite A-102
Springfield, Missouri 65804
P. 417.869.3737
F. 417.869.5678
galeshire@aleshirerobb.com

STATE OF MISSOURI } SS.
COUNTY OF PULASKI
    I, Rachelle Beasley, Circuit Clerk and ex-officio Recorder, Pulaski
County, Missouri, hereby certify the above to be a true copy of
Petition with exhibits
as the same appears of record (on file) in said court.
    WITNESS my hand and the seal of said Court at office in
Waynesville, Mo., this Aug 23 2012
               RACHELLE BEASLEY
By _____ D.C.
Circuit Clerk & ex-officio Recorder
Pulaski County

22

I, RACHELLE BEASLEY, CIRCUIT CLERK AND EX-OFFICIO RECORDER
OF PULASKI COUNTY, DO HEREBY CERTIFY THAT THE
WITHIN INSTRUMENT OF WRITING WAS ON FEBRUARY 14, 2006
AT 04:42PM, DULY FILED FOR RECORD IN THIS OFFICE IN
DOC NO.: 2006-1151

IN WITNESS WHEREOF, I HAVE HEREUNTO SET MY HAND AND
AFFIXED MY OFFICAL SEAL AT MY OFFICE IN WAYNESVILLE, MO
RACHELLE BEASLEY (CIRCUIT CLERK)

BY: _____, DEPUTY



————————————[Space Above this Line for Recording Data]————————————



Title(s) of Document:

Deed of Trust

Date of Document:
FEBRUARY 13, 2006

Grantor(s):
KENNETH D WIVELL TINA M WIVELL , husband and wife

Grantor's Address:
15515 TOP DRIVE, ST ROBERT, MO   65584

Grantee(s):
WELLS FARGO BANK, N.A.

Grantee's Address:
P.O. BOX 10304, DES MOINES, IA   503060304

Full Legal Description is located on page: 3

Reference Book(s) and Page(s), if required:

0062252507

MC Indexing Coversheet - 11/01
VMP -368C(MO) (0111)
VMP MORTGAGE FORMS - (800)521-7291





EXHIBIT
A

Return To:
WFHM FINAL DOCS X9999-01M
1000 BLUE GENTIAN ROAD
EAGAN, MN 55121

Lender address located on page 2
Trustee address located on page 2
Full Legal Description located on page 3

———— [Space Above This Line For Recording Data] ————

# DEED OF TRUST

## DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided in Section 16.

(A) "Security Instrument" means this document, which is dated FEBRUARY 13, 2006 , together with all Riders to this document.

(B) "Borrower" is KENNETH D WIVELL, ~~A MARRIED PERSON~~ and Tina M. Wivell, husband and wife

whose address is 147 BOSA DRIVE, ST ROBERT, MO    65584

Borrower is the trustor under this Security Instrument.

(C) "Lender" is WELLS FARGO BANK, N.A.

0062252507
313160385804
MISSOURI-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT          Form 3026  1/01

-6(MO) (0107)

Page 1 of 15          Initials: KDW TmW

VMP MORTGAGE FORMS - (800)521-7291

Lender is a **NATIONAL ASSOCIATION**
organized and existing under the laws of **THE UNITED STATES**
Lender's address is **P.O. BOX 10304, DES MOINES, IA   503060304**

Lender is the beneficiary under this Security Instrument.
(D) "Trustee" is **ALAN SOUTH**

Trustee's address is **4600 MADISON #801, KANSAS CITY, MO   64112**

(E) "Note" means the promissory note signed by Borrower and dated **FEBRUARY 13, 2006**
The Note states that Borrower owes Lender **ONE HUNDRED FORTY SEVEN THOUSAND AND 00/100**
Dollars
(U.S. $****147,000.00     ) plus interest. Borrower has promised to pay this debt in regular Periodic
Payments and to pay the debt in full not later than **MARCH 01, 2036**
(F) "Property" means the property that is described below under the heading "Transfer of Rights in the
Property."
(G) "Loan" means the debt evidenced by the Note, plus interest, any prepayment charges and late charges
due under the Note, and all sums due under this Security Instrument, plus interest.
(H) "Riders" means all Riders to this Security Instrument that are executed by Borrower. The following
Riders are to be executed by Borrower [check box as applicable]:

| | | |
|---|---|---|
| ☐ Adjustable Rate Rider | ☐ Condominium Rider | ☐ Second Home Rider |
| ☐ Balloon Rider | ☐ Planned Unit Development Rider | ☐ 1-4 Family Rider |
| ☒ VA Rider | ☐ Biweekly Payment Rider | ☐ Other(s) [specify] |

(I) "Applicable Law" means all controlling applicable federal, state and local statutes, regulations,
ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final,
non-appealable judicial opinions.
(J) "Community Association Dues, Fees, and Assessments" means all dues, fees, assessments and other
charges that are imposed on Borrower or the Property by a condominium association, homeowners
association or similar organization.
(K) "Electronic Funds Transfer" means any transfer of funds, other than a transaction originated by
check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic
instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit
or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller
machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse
transfers.
(L) "Escrow Items" means those items that are described in Section 3.
(M) "Miscellaneous Proceeds" means any compensation, settlement, award of damages, or proceeds paid
by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i)
damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the
Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the
value and/or condition of the Property.
(N) "Mortgage Insurance" means insurance protecting Lender against the nonpayment of, or default on,
the Loan.
(O) "Periodic Payment" means the regularly scheduled amount due for (i) principal and interest under the
Note, plus (ii) any amounts under Section 3 of this Security Instrument.
(P) "RESPA" means the Real Estate Settlement Procedures Act (12 U.S.C. Section 2601 et seq.) and its
implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to
time, or any additional or successor legislation or regulation that governs the same subject matter. As used
in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard

Initials: _KAW TMW_

Case 6:12-cv-03457-RED   Document 1-2   Filed 10/17/12   Page 25 of 43

to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

(Q) "Successor in Interest of Borrower" means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

## TRANSFER OF RIGHTS IN THE PROPERTY

This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower irrevocably grants, bargains, sells, conveys and confirms to Trustee, in trust, with power of sale, the following described property located in the

COUNTY                                              of PULASKI
[Type of Recording Jurisdiction]                    [Name of Recording Jurisdiction]

XXXX XXX XXX XX XX XXX XXXXXXXXX XXXXXXX XXXXXXX XXXXXXXXX XX XXXXXXXXXXXXXX XXXXXX
XX XXX XXXXXXXXX XXXX XXX XXXXXXXX XXXXXXXXX XXXXXXXXX XXXXXX XXXXXX XXXXXXXXXX XXXXX
XX XXXX XXXXXXXX XX XXXXXXX XXX XXXXXXX XXXXXXXX XXXXXXXXX XXXX

### See Attached Exhibit "A"

THIS IS A PURCHASE MONEY SECURITY INSTRUMENT.
TAX STATEMENTS SHOULD BE SENT TO:  WELLS FARGO HOME MORTGAGE, P.O. BOX
10304, DES MOINES, IA  503060304

Parcel ID Number:                                   which currently has the address of
15515 TOP DRIVE                                                              [Street]
ST ROBERT                                           [City], Missouri 65584    [Zip Code]
("Property Address"):

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property."

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

1. Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges. Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S.

Initials: KDW TMW

Form 3026  1/01

-6(MO) (0107)                    Page 3 of 15

currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

2. **Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

3. **Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be

Initials: KRW TMW

-6(MO) (0107)

Form 3026 1/01

Case 6:12-cv-03457-RED   Document 1-2   Filed 10/17/12   Page 27 of 43

in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

4. **Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the

Initials: _KDW_ _TMW_

Case 6:12-cv-03457-RED   Document 1-2   Filed 10/17/12   Page 28 of 43

lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

5. **Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with

Initials: KRW TMW

the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

6. **Occupancy.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

7. **Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

8. **Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

9. **Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable

Initials: _KbW_ _TMW_

attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

10. **Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.

Initials: _KCW-TMW_

(b) Any such agreements will not affect the rights Borrower has - if any - with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

11. Assignment of Miscellaneous Proceeds; Forfeiture. All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

Initials: _KDW_ _TMW_

-6(MO) (0107)

Form 3026 1/01

Case 6:12-cv-03457-RED   Document 1-2   Filed 10/17/12   Page 32 of 43

**12. Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

**13. Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

**14. Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

**15. Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

Initials _KDW_ _TMW_

Case 6:12-cv-03457-RED   Document 1-2   Filed 10/17/12   Page 33 of 43

**16. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

**17. Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

**18. Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**19. Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

**20. Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA

Initials: _KOW TMW_

requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

21. **Hazardous Substances.** As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

Initials: _KBW_ TMW

Case 6:12-cv-03457-RED   Document 1-2   Filed 10/17/12   Page 35 of 43

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

22. **Acceleration; Remedies.** Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to bring a court action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the power of sale and any other remedies permitted by Applicable Law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.

If Lender invokes the power of sale, Lender or Trustee shall mail copies of a notice of sale in the manner prescribed by Applicable Law to Borrower and to the other persons prescribed by Applicable Law. Trustee shall give notice of sale by public advertisement for the time and in the manner prescribed by Applicable Law. Trustee, without demand on Borrower, shall sell the Property at public auction to the highest bidder for cash at the time and place and under the terms designated in the notice of sale in one or more parcels and in any order Trustee determines. Trustee may postpone sale of all or any parcel of the Property to any later time on the same date by public announcement at the time and place of any previously scheduled sale. Lender or its designee may purchase the Property at any sale.

Trustee shall deliver to the purchaser Trustee's deed conveying the Property without any covenant or warranty expressed or implied. The recitals in the Trustee's deed shall be prima facie evidence of the truth of the statements made therein. Trustee shall apply the proceeds of the sale in the following order: (a) to all expenses of the sale, including, but not limited to, reasonable Trustee's and attorneys' fees; (b) to all sums secured by this Security Instrument; and (c) any excess to the person or persons legally entitled to it.

23. **Release.** Upon payment of all sums secured by this Security Instrument, Lender shall release this Security Instrument. Borrower shall pay any recordation costs. Lender may charge Borrower a fee for releasing this Security Instrument, but only if the fee is paid to a third party for services rendered and the charging of the fee is permitted under Applicable Law.

24. **Substitute Trustee.** Lender, at its option, may from time to time remove Trustee and appoint a successor trustee to any Trustee appointed hereunder by an instrument recorded in the county in which this Security Instrument is recorded. Without conveyance of the Property, the successor trustee shall succeed to all the title, power and duties conferred upon Trustee herein and by Applicable Law.

25. **Lease of the Property.** Trustee hereby leases the Property to Borrower until this Security Instrument is either satisfied and released or until there is a default under the provisions of this Security Instrument. The Property is leased upon the following terms and conditions: Borrower, and every person claiming an interest in or possessing the Property or any part thereof, shall pay rent during the term of the lease in the amount of one cent per month, payable on demand, and without notice or demand shall and will surrender peaceable possession of the Property to Trustee upon default or to the purchaser of the Property at the foreclosure sale.

26. **Homestead Exemption.** Borrower hereby waives all homestead exemptions in the Property to which Borrowers would otherwise be entitled under Applicable Law.

Initials: KBW TMW

-6(MO) (0107)

Form 3026 1/01

Case 6:12-cv-03457-RED   Document 1-2   Filed 10/17/12   Page 36 of 43

27. Notice. Oral agreements or commitments to loan money, extend credit or to forebear from enforcing repayment of debt including promises to extend or renew such debt are not enforceable. To protect you (Borrower(s)) and us (Creditor) from misunderstanding or disappointment, any agreements we reach covering such matters are contained in this writing, which is the complete and exclusive statement of the agreement between us, except as we may later agree in writing to modify it.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

Witnesses:

_____      _____ (Seal)
                                      KENNETH D WIVELL                  -Borrower

_____      _____ (Seal)
                                                                        -Borrower

_____ (Seal)     _____ (Seal)
                         -Borrower                                      -Borrower

_____ (Seal)     _____ (Seal)
                         -Borrower                                      -Borrower

_____ (Seal)     _____ (Seal)
                         -Borrower    TINA M WIVELL                     -Borrower

STATE OF MISSOURI, PULASKI                                    County ss:

On this    13th    day of    February, 2006        , before me personally appeared
KENNETH D WIVELL AND TINA M WIVELL, husband and wife

to me known to be the person(s) described in and who executed the foregoing instrument, and
acknowledged that he/she/they executed the same as his/her/their free act and deed.

IN TESTIMONY WHEREOF, I have hereunto set my hand and affixed my official seal in the
COUNTY                        and State aforesaid, the day and year first above written.

My Term Expires:   10-12-2007

                                            Notary Public        Bruce B. Warren

                    Bruce B. Warren– Notary Public
                        Notary Seal for State of
                        Missouri – Pulaski County
                    My Commission Expires 10/12/2007

Initials: KDW TMW

Form 3026  1/01

-6(MO) (0107)

## VA GUARANTEED LOAN AND ASSUMPTION POLICY RIDER

# NOTICE: THIS LOAN IS NOT ASSUMABLE WITHOUT THE APPROVAL OF THE DEPARTMENT OF VETERANS AFFAIRS OR ITS AUTHORIZED AGENT.

THIS VA GUARANTEED LOAN AND ASSUMPTION POLICY RIDER is made this 13TH day of FEBRUARY, 2006 , and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust or Deed to Secure Debt (herein "Security Instrument") dated of even date herewith, given by the undersigned (herein "Borrower") to secure Borrower's Note to WELLS FARGO BANK, N.A.

(herein "Lender") and covering the Property described in the Security Instrument and located at 15515 TOP DRIVE, ST ROBERT, MISSOURI 65584

[Property Address]

VA GUARANTEED LOAN COVENANT: In addition to the covenants and agreements made in the Security Instrument, Borrower and Lender further covenant and agree as follows:

If the indebtedness secured hereby be guaranteed or insured under Title 38, United States Code, such Title and Regulations issued thereunder and in effect on the date hereof shall govern the rights, duties and liabilities of Borrower and Lender. Any provisions of the Security Instrument or other instruments executed in connection with said indebtedness which are inconsistent with said Title or Regulations, including, but not limited to, the provision for payment of any sum in connection with prepayment of the secured indebtedness and the provision that the Lender may accelerate payment of the secured indebtedness pursuant to Covenant 18 of the Security Instrument, are hereby amended or negated to the extent necessary to conform such instruments to said Title or Regulations.

MULTISTATE VA GUARANTEED LOAN AND ASSUMPTION POLICY RIDER

VMP-538R (0310)        10/03
Page 1 of 3        Initials: [signature] TMW
VMP Mortgage Solutions (800)521-7291

LATE CHARGE: At Lender's option, Borrower will pay a "late charge" not exceeding four per centum (4%) of the overdue payment when paid more than fifteen (15) days after the due date thereof to cover the extra expense involved in handling delinquent payments, but such "late charge" shall not be payable out of the proceeds of any sale made to satisfy the indebtedness secured hereby, unless such proceeds are sufficient to discharge the entire indebtedness and all proper costs and expenses secured hereby.

GUARANTY: Should the Department of Veterans Affairs fail or refuse to issue its guaranty in full amount within 60 days from the date that this loan would normally become eligible for such guaranty committed upon by the Department of Veterans Affairs under the provisions of Title 38 of the U.S. Code "Veterans Benefits," the Mortgagee may declare the indebtedness hereby secured at once due and payable and may foreclose immediately or may exercise any other rights hereunder or take any other proper action as by law provided.

TRANSFER OF THE PROPERTY: This loan may be declared immediately due and payable upon transfer of the property securing such loan to any transferee, unless the acceptability of the assumption of the loan is established pursuant to Section 3714 of Chapter 37, Title 38, United States Code.

An authorized transfer ("assumption") of the property shall also be subject to additional covenants and agreements as set forth below:

(a) ASSUMPTION FUNDING FEE: A fee equal to one-half of one percent ( 0.5 %) of the balance of this loan as of the date of transfer of the property shall be payable at the time of transfer to the loan holder or its authorized agent, as trustee for the Department of Veterans Affairs. If the assumer fails to pay this fee at the time of transfer, the fee shall constitute an additional debt to that already secured by this instrument, shall bear interest at the rate herein provided, and, at the option of the payee of the indebtedness hereby secured or any transferee thereof, shall be immediately due and payable. This fee is automatically waived if the assumer is exempt under the provisions of 38 U.S.C. 3729 (c).

(b) ASSUMPTION PROCESSING CHARGE: Upon application for approval to allow assumption of this loan, a processing fee may be charged by the loan holder or its authorized agent for determining the creditworthiness of the assumer and subsequently revising the holder's ownership records when an approved transfer is completed. The amount of this charge shall not exceed the maximum established by the Department of Veterans Affairs for a loan to which Section 3714 of Chapter 37, Title 38, United States Code applies.

(c) ASSUMPTION INDEMNITY LIABILITY: If this obligation is assumed, then the assumer hereby agrees to assume all of the obligations of the veteran under the terms of the instruments creating and securing the loan. The assumer further agrees to indemnify the Department of Veterans Affairs to the extent of any claim payment arising from the guaranty or insurance of the indebtedness created by this instrument.

Initials: KAW TMW

-538R (0310)

Page 2 of 3

IN WITNESS WHEREOF, Borrower(s) has executed this VA Guaranteed Loan and Assumption Policy Rider.

_____  -Borrower        _____  -Borrower
KENNETH D WIVELL


_____  -Borrower        _____  -Borrower


_____  -Borrower        _____  -Borrower
TINA N WIVELL


_____  -Borrower        _____  -Borrower


VMP-538R (0310)                    Page 3 of 3

Exhibit "A"

All of Lot 52 in THOUSAND HILLS SUBDIVISION PLAT 17, a Subdivision in Pulaski County, Missouri, per the plat thereof filed in the Recorder's Office of Pulaski County, Missouri.

STATE OF MISSOURI } ss.
COUNTY OF PULASKI }
    I, Rachelle Beasley, Circuit Clerk and ex-officio Recorder, Pulaski
County, Missouri, hereby certify the above to be a true copy of

Deed of Trust

as the same appears of record (on file) in said court.
    WITNESS my hand and the seal of said Court at office in
Waynesville, Mo., this_____July 9, 2012
                      RACHELLE BEASLEY

By Marissa Stellive
Circuit Clerk & ex-officio Recorder
Pulaski County